IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JULIA MULANAX,                                           05-CV-421-BR

                  Plaintiff,                         OPINION AND ORDER

v.

JO ANNE B. BARNHART, Commissioner
of Social Security,


                  Defendant.


**TIM WILBORN**
2020-C SW 8th Avenue, PMB #294
West Linn, Oregon  97068
(503) 697-7019

              Attorney for Plaintiff

**KARIN J. IMMERGUT**
United States Attorney
**NEIL J. EVANS**
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, OR  97204-2902
(503) 727-1053


1- OPINION AND ORDER

**MICHAEL McGAUGHRAN**
Office of the General Counsel
**DAVID R. JOHNSON**
Special Assistant United States Attorney
Social Security Administration
701 5th Avenue, Suite 2900 M/S 901
Seattle, WA  98104-7075
     (206) 615-2545

          Attorneys for Defendant


**BROWN, Judge.**

     Plaintiff Julia Mulanax brings this action for judicial

review of a final decision of the Commissioner of the Social

Security Administration denying her application for disability

insurance benefits (DIB) under Title II of the Social Security

Act.  42 U.S.C. §§ 401-433.  This Court has jurisdiction under

42 U.S.C. § 405(g).

     Following a thorough review of the record, the Court **AFFIRMS**

the Commissioner's decision and **DISMISSES** this matter.


### ADMINISTRATIVE HISTORY

     Mulanax filed for DIB benefits on November 21, 2001,

alleging disability beginning October 1, 2001,[1] based on

fibromyalgia, chronic fatigue, arthritis, degenerating discs, and

---

     [1] A claimant seeking benefits under Title II must show she
became disabled during a period in which she had "insured status"
under the program.  *See* 42 U.S.C. § 416(I)(3).  Mulanax was
insured through the date of the ALJ's decision.

hepatitis C.  Tr. 22, 93-95.[2]  Her application was denied

initially and on reconsideration.  Tr. 78-82, 85-87.  An

Administrative Law Judge (ALJ) conducted a hearing at Mulanax's

request on May 19, 2004.  Mulanax was represented by an attorney.

The ALJ issued an opinion on July 26, 2004, in which he found

Mulanax was not disabled within the meaning of the Act.  That

decision became the final decision of the Commissioner on

March 4, 2005, when the Appeals Council denied Mulanax's request

for review.  *See* 20 C.F.R. §§ 404.891, 422.210.


## MULANAX'S CLAIMS OF ALJ ERROR

Mulanax asserts the ALJ erred when he (1) failed to develop

the record fully and fairly ; (2) improperly found Mulanax's

receipt of unemployment benefits was inconsistent with

disability; (3) failed to provide legally sufficient reasons to

reject lay-witness testimony; (4) failed to apply the correct

legal standards when assessing Mulanax's credibility and

improperly rejected her testimony; (5) failed to provide legally

sufficient reasons for rejecting the opinion of Stephen Tibbitts,

Ph.D.; (6) failed to provide legally sufficient reasons for

rejecting the opinion of James Calvert, Jr., M.D.; and

---

[2] Citations to "Tr." refer to the page(s) indicated in the
official transcript of record filed with the Commissioner's
Answer.

(7) improperly found Mulanax's migraine headaches were controlled by medication.

## STANDARDS

The initial burden of proof rests on the claimant to establish disability. *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir. 1995), *cert. denied*, 517 U.S. 1122 (1996). To meet this burden, a claimant must demonstrate his inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner bears the burden of developing the record. *DeLorme v. Sullivan*, 924 F.2d 841, 849 (9th Cir. 1991).

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g). *See also Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).

The ALJ is responsible for determining credibility, resolving conflicts in the medical evidence, and resolving ambiguities. *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001). The court must weigh all of the evidence whether it supports or detracts from the Commissioner's decision. *Martinez v. Heckler*, 807 F.2d 771, 772 (9th Cir. 1986). The Commissioner's decision must be upheld even if the "evidence is susceptible to more than one rational interpretation." *Andrews,* 53 F.3d at 1039-40. The court may not substitute its judgment for that of the Commissioner. *Batson,* 359 F.3d at 1193.

## DISABILITY ANALYSIS

### I. Regulatory Sequential Evaluation

The Commissioner has established a five-step sequential process for determining whether a person is disabled. *Bowen v. Yuckert,* 482 U.S. 137, 140 (1987). *See also* 20 C.F.R. § 416.920. The claimant bears the burden of proof at Steps One through Four. *See Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). Each step is potentially dispositive.

In Step One, the claimant is not disabled if the Commissioner determines the claimant is engaged in substantial gainful activity. *Yuckert*, 482 U.S. at 140. *See also* 20 C.F.R. § 416.920(b).

In Step Two, the claimant is not disabled if the Commissioner determines the claimant has no "medically severe impairment or combination of impairments." *Yuckert*, 482 U.S. at 140-41. *See also* 20 C.F.R. § 416.920(c).

In Step Three, the claimant is disabled if the Commissioner determines the claimant's impairments meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Yuckert*, 482 U.S. at 140-41. *See also* 20 C.F.R. § 416.920(d). The criteria for the listed impairments, known as Listings, are enumerated in 20 C.F.R. pt. 404, subpt. P, app. 1 (Listing of Impairments).

If the Commissioner proceeds beyond Step Three, she must assess the claimant's residual functional capacity (RFC). The claimant's RFC is an assessment of the sustained, work-related activities the claimant still can do on a regular and continuing basis despite her limitations. 20 C.F.R. § 416.945(a). *See also* Social Security Ruling (SSR) 96-8p.

In Step Four, the claimant is not disabled if the Commissioner determines the claimant retains the RFC to perform work he has done in the past. *Yuckert*, 482 U.S. at 141-42. *See also* 20 C.F.R. § 416.920(e).

If the Commissioner reaches Step Five, she must determine whether the claimant is able to do any other work that exists in

the national economy. *Yuckert*, 482 U.S. at 141-42. *See also* 20 C.F.R. § 416.920(e), (f). Here the burden shifts to the Commissioner to show a significant number of jobs exist in the national economy that the claimant can do. *Yuckert*, 482 U.S. at 141-42. *See also Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). The Commissioner may satisfy this burden through the testimony of a VE or by reference to the Medical-Vocational Guidelines set forth in the regulations at 20 C.F.R. Part 404, Subpart P, Appendix 2. If the Commissioner meets this burden, the claimant is not disabled. 20 C.F.R. § 416.920(f)(1).

## II.  **ALJ's Findings**

At Step One, the ALJ found Mulanax had not engaged in substantial gainful activity since her alleged disability onset date. Tr. 23. *See* also 20 C.F.R. § 404.1520(b). Mulanax does not dispute this finding.

At Step Two, the ALJ found Mulanax had "severe" impairments of cervical degenerative disc disease, fibromyalgia, and migraine headaches controlled by medication. Tr. 24. *See* also 20 C.F.R. § 404.1520(c). Mulanax disputes this finding.

At Step Three, the ALJ determined Mulanax's impairments did not meet or equal the requirements of a Listed Impairment sufficiently severe to automatically constitute disability. Tr. 24. *See* also 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d). Mulanax disputes this finding.

The ALJ assessed Mulanax with the RFC to perform light work limited by the need to avoid climbing ladders, ropes, and scaffolds and involving no more than occasional climbing, stooping, kneeling, crouching, or crawling.  Tr. 28.  *See also* 20 C.F.R. §§ 404.1520(e), 404.1545.  Mulanax disputes this finding.

At Step Four, the ALJ found Mulanax remained capable of performing her past relevant work as a receptionist, cashier I, billing clerk, account clerk, and waitress.  Tr. 28-29.  *See also* 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f).  Mulanax disputes this finding.

Because the ALJ's finding at Step Four was dispositive of the question of disability, the ALJ did not continue to Step Five.

**DISCUSSION**

**I.    The ALJ properly developed the record.**

Mulanax argues the ALJ was obligated to request RFC assessments from each of her medical sources under 20 C.F.R. §§ 404.1513(b)(6) and (c), but he failed to do so.

Section 404.1513 discusses the types and sources of medical evidence the ALJ shall consider in the disability evaluation. Specifically, § 404.1513(b) lists the information that medical reports should include such as (1) medical history, (2) clinical

findings, (3) laboratory findings, (4) diagnosis, (5) treatment prescribed with response and prognosis, and (6) a "statement about what you can still do despite your impairment(s) based on the acceptable medical source's findings on the factors [listed above]."  Section 404.1513(b)(6) also provides:  "Although we will request a medical source statement about what you can still do despite your impairment(s), the lack of the medical source statement will not make the report incomplete."

Section 404.1513(c), "Statements about what you can still do," provides the ALJ "will consider residual functional capacity assessments made by State agency medical and psychological consultants and other program physicians and psychologists to be 'statements about what you can still do' made by non-examining physicians and psychologists based on their review of the evidence in the case record."

Contrary to Mulanax's contention, these sections do not require the ALJ to request a statement about what the claimant can still do from "all acceptable medical sources."  Section 404.1513(b)(6) only requires the ALJ to request a statement about what the claimant can still do from an unspecified source, and Section 404.1513(c) indicates this source may be a State medical consultant.

Here the ALJ specifically requested a statement from Jeremy Goodwin, M.D., about what Mulanax could still do.  Tr. 194.  It

does not appear Dr. Goodwin honored this request.  The ALJ,
therefore, apparently relied on the RFC assessment performed by
State agency physicians who concluded Mulanax had mild
restrictions in activities of daily living; mild difficulties in
social functioning; and mild difficulties in maintaining
concentration, persistence, or pace.  Tr. 25.  These findings
were supported by substantial evidence in the record.

    In addition, the regulations clearly provide the claimant
has the burden to present medical evidence of disability.
20 C.F.R. § 404.1512(c).  Section 404.1512(d)(1) provides the ALJ
will help the claimant obtain medical reports by making an
initial request and one follow-up request.  If the evidence
provided by a claimant's medical sources is not sufficient for
the ALJ to determine whether a claimant is disabled or if the
evidence provided by a claimant's medical source "contains a
conflict or ambiguity that must be resolved," the ALJ shall
recontact that medical source.  20 C.F.R. § 404.1512(e).  If
other evidence in the record, however, is sufficient for the ALJ
to determine whether the claimant is disabled or to resolve a
conflict or ambiguity in the medical evidence, the ALJ need not
recontact the medical source.  *Mayes v. Massanari*, 276 F.3d 453,
459-60 (9th Cir. 2001).

    Here the Court infers the ALJ did not find it necessary to
recontact Mulanax's medical providers because any conflicts or

ambiguities in the medical evidence could be resolved by reference to other evidence in the record.  *See Magallanes v. Bowen*, 881 F. 2d 747, 755 (9th Cir. 1989)(court may draw specific and legitimate inferences from the ALJ's decision). Accordingly, the Court finds the ALJ did not err in his development of the record.

## II.  Substantial evidence supports the ALJ's credibility assessment.

According to Mulanax, the ALJ's reasons for discrediting her testimony were not clear and convincing nor sufficiently specific to satisfy that standard.

Disability benefits would be available on demand if the ALJ was required to credit every allegation of disabling pain.  *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).  After a claimant establishes the existence of an impairment and a causal relationship between the impairment and some level of symptoms, however, the ALJ must provide clear and convincing reasons supported by substantial evidence for rejecting the claimant's subjective claims.  *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595 (9th Cir. 1999).  *See also Thomas v. Barnhart,* 278 F.3d 947, 958-59 (9th Cir. 2002).

When assessing a claimant's credibility, the ALJ may consider:  (1) ordinary techniques of credibility evaluation such as the claimant's reputation for truthfulness, prior inconsistent statements concerning the symptoms, and other testimony by the

claimant that appears less than candid; (2) unexplained or
inadequately explained failure to seek treatment or to follow a
prescribed course of treatment; (3) the claimant's daily
activities; (4) the objective medical evidence; (5) the location,
duration, frequency, and intensity of symptoms; (6) precipitating
and aggravating factors; (7) the type, dosage, effectiveness, and
side effects of any medication; and (8) treatment other than
medication. *Smolen v. Chater*, 80 F.3d 1273, 1281-82 (9th Cir.
1996).

     Here the ALJ applied the proper standard when he found
Mulanax's testimony less than fully credible.  The ALJ found
Mulanax's description of her pain to be "exaggerated and
theatrical."  He noted she described her back pain as "an insane
type of pain" along her entire spine.  Tr. 24-27, 60.  She also
described a burning sensation that was "kind of like if somebody
. . . had taken Ben Gay and picked up your skin and rubbed it
. . . inside of your back."  Tr. 60.

     Mulanax interprets the ALJ's characterization of her pain
description to mean that she should have been more articulate
than she was capable of being.  The Court disagrees.  When
assessing Mulanax's credibility, the ALJ properly could consider
that her statements seemed overly dramatic and exaggerated.  *See
Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001).

The ALJ also found Mulanax had never complained to her medical providers about this type of pain and, in addition, the objective medical evidence did not substantiate the type or degree of pain she claimed to experience.  Tr. 27.  He noted an MRI showed only degenerative spurring, and there was not any documentation of neurological abnormalities.  The ALJ thoroughly reviewed the records provided by Mulanax's primary-care physician, including evidence that she told Dr. Calvert on the day she allegedly became disabled that she "was feeling great until she got fired" and that she had "generalized pain . . . tender points here and there but the pain shifts into different joints." Tr. 290.  Dr. Calvert found Mulanax to be "generally tender," but not in extreme pain.  Tr. 290.  Neck pain was Mulanax's only consistent complaint to Dr. Calvert even after an automobile collision and after stopping her pain medication for a time.  Tr. 25-26, 381, 386.  She also told Dr. Calvert that her medication controlled her pain well and caused "minimal side effects."  Tr. 287, 288-90.  Even in the months immediately preceding the hearing, Dr. Calvert repeatedly reported Mulanax was managing her pain well.  Tr. 26, 375-77.

Mulanax argues an MRI would have shown some abnormalities and would have substantiated her pain complaints.  She asserts, in any event, she also has a diagnosis of fibromyalgia.  The ALJ, however, properly considered the lack of objective medical

evidence to support her complaints and the inconsistency between
Mulanax's reports to her medical providers and her testimony at
the hearing.

The ALJ also noted Mulanax collected unemployment benefits
for at least one year after her alleged onset of disability.  To
be eligible for unemployment benefits, an applicant must assert
she is capable of working and is actively seeking work.  Thus,
the ALJ found Mulanax's receipt of unemployment benefits is
inconsistent with her contention that she is disabled.
According to Mulanax, however, her receipt of unemployment
benefits was "fully consistent with [her] allegation of
disability" because under Oregon law an unemployment recipient
certifies only that she is available for "some work," which
includes temporary and/or part-time work.  *See* Oregon
Administrative Rules §§ 471-30-036(2)(b),(3).  Mulanax also cites
the regulations under Title XVI to support her argument that a
DIB claimant who files for unemployment should not be punished
for doing so in light of the fact that a Social Security
insurance (SSI) claimant must file for unemployment benefits
in order to be eligible for receipt of SSI.  *See* 20 C.F.R.
§§ 416.210(a),(b) and 416.1330.

The Court notes Title XVI does not apply in this matter and,
therefore, is irrelevant.  With respect to the Oregon
Administrative Rules, however, the Court agrees with Mulanax's

contention that eligibility for unemployment benefits in this
state does not require the ability to work full-time.  The ALJ,
however, reasonably could find that even the ability to perform
part-time work exceeded Mulanax's assertions to the ALJ that she
cannot work because of fatigue, head, neck and back pain, and
depression.  Tr. 62.

The ALJ also found Mulanax's refusal of a job referral in
2002 based partly on her assertion that she could not drive 20
minutes demonstrated evidence of mere self-limitation and a lack
of motivation to work.  The ALJ noted:

> When queried about a job search as she had been
> referred by the Department of Employment the claimant
> indicated she felt it was too painful to drive there; a
> distance of 15 to 20 minutes, and told the employer she
> could not sit and do computer work.  It appears that
> there is a lack of motivation on the part of Ms.
> Mulanax as she previously reported she had no
> difficulty driving; in fact since moving in with her
> fiancé she would drive to her storage place and take
> boxes home, to be unpacked.

Tr. 27.

Mulanax argues she is able to drive, but not without pain.
She points to a Reconsideration Disability Report that she filled
out on October 10, 2002, in which she reported:  "I have a hard
time driving, because of turning my neck & body."  Tr. 176.
As the Commissioner points out, however, the record contains
numerous contemporaneous references to Mulanax being able to
drive whenever she chooses.  For example, on June 10, 2002, Dr.
Calvert noted Mulanax reportedly "functions pretty well and

pretty much can do what she needs to do" despite her neck pain.
Tr. 287.  On August 29, 2002, Dr. Tibbitts stated Mulanax had
been driving to her storage unit to retrieve and to unpack boxes
after moving in with her fiancé.  Tr. 320.  In October 2003,
Mulanax reportedly was driving a car and was rear-ended.  Tr.
381.  In January 2004, she told Dr. Calvert that her neck was
"fully improving" thanks to physical therapy, and Dr. Calvert
reminded Mulanax in February 2004 to avoid driving after smoking
marijuana.  Tr. 376, 379.  It, therefore, appears to be
reasonable for the ALJ to resolve this evidence by determining
Mulanax's claim that she couldn't drive 20 minutes to a job was
attributable to a lack of motivation to work rather than to a
true inability to drive 20 minutes.

     The ALJ also determined Mulanax's claim that she was
terminated from her last job because she regularly fell asleep at
work was not substantiated by the record.  Tr. 28, 56.  Indeed,
Mulanax never complained to any of her medical providers that she
was falling asleep at work even though she did report problems
with co-workers.  Tr. 295.  Mulanax argues it is irrelevant that
the record does not corroborate her claims of falling asleep at
work because the ALJ could not discredit her statement without
substantial evidence to the contrary.  The burden, however, is on
the claimant to produce evidence substantiating her claims rather

than on the ALJ to produce evidence disproving those claims.  *See Roberts,* 66 F.3d at 182.  *See also* 20 C.F.R. § 404.1512(a).

Accordingly, the Court concludes it was reasonable for the ALJ to find the fact that Mulanax discussed her work with her medical providers, stated her job was "going great," and did not report falling asleep at work discredited her claims to the Social Security Administration that she cannot work because of fatigue.  Tr. 295.

Finally, the ALJ did not find any evidence to support Mulanax's claim that her condition was "progressive" or that her symptoms had exacerbated since she stopped working.  Tr. 28.  To the contrary, Dr. Calvert's records reflect Mulanax's disability onset date corresponded with the loss of her job, and she was "feeling great" and "doing pretty well" until then.  Tr. 290. Rather than chronicling degeneration, Dr. Calvert's reports reflect Mulanax "seem[ed] healthy" after losing her job, appeared "to be in a pretty good state of mind," and seemed "to be better since she is not working."  Tr. 287-89.  Although Mulanax reported some difficulty with breakthrough pain, she continued to improve overall and began smoking marijuana because she felt it made her more functional.  Tr. 376, 379-80, 382.

Mulanax further argues fibromyalgia is a progressive disease, and she reported worsening symptoms over the past four years.  She, however, does not identify the medical sources to

whom she made these reports.  Mulanax also does not cite to
evidence in the record to support her contention that Dr.
Calvert's chart notes establish a worsening of her headaches,
depressive disorder, neck and shoulder pain, and/or fatigue.
Even though an MRI performed on February 11, 2004, shows a
progression of her spine condition when compared to an MRI
performed on April 13, 2000, the February 2004 MRI "impression"
report indicates only that "compared to previous, [C4-5 and C5-6]
may have worsened slightly in the interval.  Otherwise negative
cervical MRI scan."  Tr. 217, 353.  Accordingly, the Court
concludes the ALJ reasonably determined the overwhelming weight
of the medical evidence did not support a finding that Mulanax's
impairments were progressive.

In summary, the Court finds the ALJ did not err when he
discredited Mulanax's testimony because he gave clear and
convincing reasons based on substantial evidence in the record
for doing so.

## III. The ALJ's failure to discuss lay-witness statements was harmless.

Mulanax contends the ALJ erred by failing to discuss the
"Third Party Information" sheet filled out by her friend, Diana
Long, on August 8, 2002.  In particular, Mulanax asserts the
statement by Ms. Long that she has seen Mulanax "get so tired she

puts her head on the desk at work [and] could fall asleep," if properly credited, establishes that Mulanax is disabled.

Although the ALJ must account for lay-witness testimony and provide germane reasons for rejecting it, he is not required to discuss nonprobative information. *See Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001). *See also Vincent ex. rel. Vincent v. Heckler*, 739 F.2d 1393, 1394-95 (9th Cir. 1984).

Although Mulanax is correct that the ALJ did not comment on Ms. Long's statement, his failure to do so was harmless because Ms. Long's statement did not add anything to the record. Mulanax testified to much more extreme fatigue than Ms. Long identified. Thus, even if Ms. Long's testimony were credited, it would have been cumulative and, thus, would have had little or no effect on the outcome of this case.

## IV.  Substantial evidence supports the ALJ's assessment of the medical evidence.

Mulanax contends the ALJ failed to provide legally sufficient reasons to support his rejection of the opinions of Drs. Tibbitts and Calvert.

A treating physician's opinion is given controlling weight only when his opinion is well-supported by "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantiated evidence" in the record. *See* 20 C.F.R. § 404.1527(d)(2).  The ALJ must provide

clear and convincing reasons supported by substantial evidence in the record for rejecting the opinion of a claimant's physician when that opinion is not contradicted by another doctor. *See Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d at 600. If a treating physician's opinion is contradicted by another doctor, the ALJ may reject it by providing "specific and legitimate reasons" supported by substantial evidence in the record. *Id.* at 600-01.

### A.    Dr. Tibbitts

Mulanax contends the ALJ erred when he rejected a global assessment of functioning (GAF) score determined by Dr. Tibbitts on August 29, 2002, during a one-time psychological evaluation. Tr. 317-21. According to Mulanax, the GAF score of 55 establishes she has a severe mental impairment and, therefore, is presumptively disabled under the Listed Impairments.

The ALJ reviewed Dr. Tibbitts's general findings that Mulanax was able to maintain eye contact and that her speech was normal. Tr. 25. Dr. Tibbitts noted Mulanax told him that she had pain in her upper neck, the middle of her back, and sometimes in her legs and elbows. Tr. 25. The ALJ noted Mulanax "demonstrated adequate independence, appropriateness, and persistence of daily living activities." Tr. 25. He also found Dr. Tibbitts's determination that Mulanax had a GAF of 55 indicated "some moderate symptoms" and her "stressors related to

unemployment and economic problems."  Tr. 25.  The ALJ concluded "[t]he moderate problem score reflected the economic problems and apparently not the depression or anxiety."  Tr. 25.

A GAF score is only an estimate of a claimant's overall level of functioning.  *See Diagnostic and Statistical Manual of Mental Disorders IV* (DSM-IV) 30 (4th ed. 2000).  A GAF score is not a substitute for the required objective medical evidence and work-related functional assessments needed to establish disability under the Social Security Act.

While the ALJ did not reject Dr. Tibbitts's opinion that Mulanax was suffering symptoms of depression, he rejected the degree of limitation that Dr. Tibbitts attributed to her depression.  Tr. 25.  Unlike Dr. Tibbitts, who was not Mulanax's treating physician and who only evaluated her for an hour, the ALJ had the benefit of Mulanax's entire medical record.  The ALJ found the medical record as a whole did not support more than mild limitations due to depression.  Tr. 28.
Accordingly, the Court finds the ALJ did not err when he discounted Dr. Tibbitts's opinion because he provided specific and legitimate reasons supported by evidence in the record for doing so.

**B.  Dr. Calvert**

Mulanax contends the ALJ erred when he rejected

Dr. Calvert's November 21, 2004, "check-the-box assessment" of Mulanax's RFC.  On that form, which was prepared by Mulanax's attorney, Dr. Calvert indicated the following:  (1) Mulanax was not capable of performing sustained light or sedentary work on a regular and continuing basis; (2) Mulanax would not be able to perform sustained work activity even with the freedom to alternate sitting and standing; (3) Mulanax was "moderately" limited in her ability (a) to maintain attention and concentration for extended periods, (b) to perform activities within a schedule and to maintain regular attendance, and (c) to complete a normal workday/workweek without interruptions; and (4) Mulanax's limitations are expected to last for at least 12 months.  Tr. 369-72.

The ALJ found numerous contradictions between Dr. Calvert's check-the-box assessment and his treatment records.  Tr. 26-27. For example, the ALJ noted Dr. Calvert indicated his check-the-box assessment was based on Mulanax's "severe pain in her back and abdomen."  Nevertheless, Dr. Calvert's clinical records reflect numerous examinations of Mulanax's abdomen were negative, and Dr. Calvert never reached a diagnosis related to Mulanax's abdominal complaints.  Tr. 376.  As the ALJ correctly stated, symptoms standing alone are not sufficient to establish a medically determinable impairment.  *See Ukolov v. Barnhart*, 420 F.3d 1002, 1005 (9th Cir. 2005).

Mulanax reiterates her contention that the ALJ should have recontacted Dr. Calvert if the ALJ was not satisfied that the objective medical evidence supported the boxes checked by Dr. Calvert.  As noted, however, the ALJ is not required to do so because he was able to resolve any ambiguity in the check-the-box form by referring to Dr. Calvert's narrative medical records.

The ALJ also observed check-the-box assessments are generally disfavored, and this one in particular was "designed to eliminate" the possibility that a claimant could perform light or sedentary work.  Tr. 26.  *See also Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d at 1193.  The ALJ further noted when definitions are provided to the physician to select, they are "not the definitions used by the Social Security Administration."  The ALJ pointed out the questions presented to Dr. Calvert were extracted from a form used by the Social Security Administration that contained many additional questions necessary to develop a complete picture of a claimant's limitations.  Although the ALJ found he could not fault a physician for filling out this form without being informed of the "gamesmanship" involved in its preparation, the ALJ determined the form, nevertheless, was entitled to little weight.

Mulanax, however, contends the ALJ applied a different standard to Dr. Calvert than he did to state-agency physicians who also filled out check-the-box assessments.  Mulanax's

argument overlooks the ALJ's detailed explanation of the reasons why the form used by Dr. Calvert was misleading:  Even though check-the-box forms are generally entitled to less weight, the forms officially prepared by the Social Security Administration are entitled to more weight than forms privately designed by a claimant's attorney.

The ALJ also found Dr. Calvert's opinion was unpersuasive because it took the form of an improper administrative finding reserved to the Commissioner.  A physician's statement about a claimant's ability to work is an administrative finding rather than a proper medical opinion.  SSR 96-5p.  *See* 20 C.F.R. § 404.1527(d)(2).  Disability has both a medical and a vocational component.  20 C.F.R. § 416.960.  Because a medical source does not have the expertise to comment on the vocational component of disability, a statement by a medical source that a person is unable to work is not accorded much weight.  20 C.F.R. § 416.927(e)(1).  The ALJ must consider all of the medical opinions about a claimant's condition and functional limitations together with all other evidence in the record to determine whether a claimant is disabled under the Social Security Act. SSR 96-5p.  Nevertheless, Mulanax relies on SSR 96-5p to support her argument that the ALJ still must "carefully consider" a physician's opinion even when it relates to an issue reserved to the Commissioner.  The Court, however, finds the ALJ did so.

Finally, the ALJ noted Dr. Calvert must have relied on Mulanax's subjective reports, which the ALJ found not credible, because the objective medical evidence did not support Dr. Calvert's opinion that Mulanax had extreme limitations.  For example, the ALJ noted Mulanax had been working full-time until her position was eliminated "not because of any inability on her part to perform the work."  Mulanax, however, argues the ALJ had a duty to contact her former employer to ascertain whether she was terminated due to her poor work performance because the record is silent regarding the official reason why she stopped working.  According to Mulanax, if her employer agreed she was terminated because she was falling asleep on the job, "this would be fully corroborative of Dr. Calvert's opinion that [she] cannot sustain light or sedentary work." Again, Mulanax's argument fails to recognize that the burden is on her to prove she is disabled by producing objective medical evidence to establish she suffers from severe impairments that significantly limit her ability to perform work-related activities.  Although evidence from her employer that she was terminated because she fell asleep at work might have increased Mulanax's credibility on this point, it still would not be an acceptable substitute for the objective medical evidence necessary to support Dr. Calvert's opinion.  Regardless of the number of witnesses she produced, Mulanax still would have to

show her alleged fatigue was caused by a medically determinable illness that was expected to last for a continuous period of at least 12 months to be entitled to Social Security benefits.

Accordingly, the Court finds the ALJ did not err when he discounted Dr. Calvert's opinion because he gave legally sufficient reasons for doing so that were supported by evidence in the record.

**V.  Substantial evidence supports the ALJ's findings at Step Two related to the severity of Mulanax's impairments.**

As part of her argument that the ALJ erroneously discredited her testimony, Mulanax contends "the uncontradicted record" establishes she has severe depression or severe chronic pain syndrome, and, therefore, the ALJ erred when he found otherwise. Mulanax, however, does not identify any evidence in the record to support her contention.

To progress beyond Step Two of the sequential evaluation, a disability claimant must prove (a) she has a "medically determinable physical or mental impairment" and (b) the impairment is severe within the meaning of the Social Security Act.  *See* 20 C.F.R. §§ 416.905, 416.920(c).  *See also Edlund v. Massanari*, 253 F.3d 1152, 1159-60 (9th Cir. 2001).  To show a "medically determinable physical or mental impairment," the claimant must proffer medical evidence from "acceptable medical sources" listed in 20 C.F.R. § 416.913 such as licensed

physicians and licensed psychologists.  This evidence must include:  (1) medical history, (2) clinical findings, (3) laboratory findings, (4) diagnosis, (5) treatment prescribed and the claimant's response and prognosis, and (6) a statement about what the claimant can still do despite his impairment(s) "based on the acceptable medical source's findings."  20 C.F.R. §§ 416.908, 416.912.

To show an impairment is "severe," the medical evidence must establish the impairment significantly limits the claimant's ability to do basic work activities such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, and handling; understanding, carrying out, and remembering simple instructions; using judgment; responding appropriately to supervisors, to co-workers, and in usual work situations; and dealing with changes in a routine work setting.  20 C.F.R. § 416.921.  An impairment is not severe if it has no more than a minimal effect on the claimant's ability to do these types of activities.  SSR 96-3p.

Even if a claimant fails to meet the requirements for proving she suffers from a severe impairment, the ALJ still will consider the combined effect of all of her alleged impairments to determine whether the combined impact precludes the claimant from engaging in substantial gainful activity.  20 C.F.R. § 416.923.

27- OPINION AND ORDER

Here the ALJ found Mulanax had "severe" cervical degenerative disc disease, fibromyalgia, and migraine headaches that were controlled by medication.  Tr. 24.  He found Mulanax's alleged mental impairments were not severe because they were situational (*i.e.*, related to being terminated from her job) and were not expected to last for a continuous period of at least 12 months.  Tr. 24.  Other than taking Amitriptyline, which was prescribed by Dr. Calvert, her primary-care physician, to address depression and migraine headaches, Mulanax did not undergo therapy for depression or severe chronic-pain syndrome.  Tr. 386. After applying for benefits, she was evaluated by Dr. Tibbitts at the Social Security Administration's expense, and Dr. Tibbitts concluded Mulanax suffered from moderate depression.  Tr. 321. As noted, the ALJ accepted Dr. Tibbitts's opinion that Mulanax was depressed due to loss of employment, but he rejected Dr. Tibbitts's opinion that Mulanax's depression caused even moderate limitations.  The Court already has determined the ALJ did not err when he discounted Dr. Tibbitts's opinion at Step Two because the ALJ provided legally sufficient reasons for doing so.

In addition, Mulanax, as noted, fails to identify any medical evidence overlooked by the ALJ that would establish Mulanax suffers from severe depression or chronic-pain syndrome or that these impairments caused work-related functional impairments.  The Court, therefore, finds there is substantial

evidence in the record to support the ALJ's determination at Step Two.

**VI. Substantial evidence supports the ALJ's finding at Step Three that Mulanax's impairments do not meet or equal a Listed Impairment.**

Although Mulanax does not explicitly allege the ALJ failed to consider whether her impairments meet or equal a Listed Impairment at Step Three, Mulanax argues the GAF score of 55 assessed by Dr. Tibbitts establishes "her depression and anxiety impairments are so severe that they meet [Listed Impairments] 12.04 and 12.06."

It is not clear whether Mulanax's attorney argued equivalence at the hearing.  In any event, the ALJ considered whether any of Mulanax's impairments met or equaled the criteria of a Listed Impairment and determined they did not.  Tr. 24. Although blanket assertions of equivalence to a Listed Impairment without an accompanying theory of equivalency ordinarily do not warrant review, this Court will consider Mulanax's claim in this instance.

The Listed Impairments are enumerated in 20 C.F.R. Part 404, Subpart P, Appendix 1.  To establish that her impairments equal Listed Impairment 12.04 based on Affective Disorder, Mulanax must prove her impairments meet the requirements of (A) and (B) or (C) as set out below:

(A) Medically documented persistence, either continuous or intermittent, of one of the following:
    (1) depressive syndrome;
    (2) manic syndrome;
    (3) bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes.

(B) Resulting in at least two of the following:
    (1) marked difficulties in activities of daily living;
    (2) marked difficulties in maintaining social functioning;
    (3) marked difficulties in maintaining concentration, persistence, or pace;
    (4) repeated episodes of decompensation, each of extended duration.

(C) Medically documented history of a chronic affective disorder of at least 2 years duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
    (1) repeated episodes of decompensation, each of extended duration;
    (2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate;
    (3) current history of one or more years inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

Mulanax does not identify evidence in the record sufficient to meet any of the above criteria. Although she reported experiencing depression after losing her job, the ALJ reasonably determined Mulanax suffered only mild, work-related, functional impairments as a result.

To establish that her impairments equaled Listed Impairment 12.06 based on Anxiety Related Disorders, Mulanax must show her impairments meet the requirements of (A) and (B) or (A) and (C) as set out below:

> (A) Medically documented findings of at least one of the following:
>
>> (1) Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:
>>> (a) motor tension;
>>> (b) autonomic expectation;
>>> (c) apprehensive expectation
>>> (d) vigilance and scanning;
>>
>> (2) A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation;
>>
>> (3) Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week;
>>
>> (4) Recurrent obsessions or compulsions which are a source of marked distress;
>>
>> (5) Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress.
>
> (B) Resulting in at least two of the following:
>> (1) Marked restriction of activities of daily living;
>> (2) Marked difficulties in maintaining concentration, persistence, or pace;
>> (3) Marked difficulties in maintaining social functioning;
>> (4) Repeated episodes of decompensation, each of extended duration.

(C) Resulting in complete inability to function independently outside the area of one's home.

Although there are scattered references in the record to Mulanax feeling anxious following the death of her mother, Mulanax was never diagnosed with Anxiety Disorder.  Thus, after reviewing the record, this Court does not find any evidence sufficient to meet the criteria of (A), (B), or (C) nor does Mulanax identify any such evidence.

In summary, the Court finds the record does not support Mulanax's contention that her impairments meet or equal a Listed Impairment.

## CONCLUSION

For these reasons, the Court **AFFIRMS** the Commissioner's decision and **DISMISSES** this case.

IT IS SO ORDERED.

DATED this 9th day of May, 2006.


/s/ Anna J. Brown

_____
ANNA J. BROWN
United States District Judge